# WILLIAM M. IRVIN v. STATE.

No. A-1776.    Opinion Filed February 24, 1915.

(146 Pac. 453.)

1. **EVIDENCE—Acts and Declarations of Conspirators.** On a trial for murder, when a conspiracy is shown, or evidence adduced which fairly tends to show a conspiracy, then the acts and declarations of the conspirators, in furtherance of its purpose and object, are competent, and it is not necessary, in order to make such evidence competent, that the conspiracy should be charged in the information.

2. **SAME.** Where there is testimony tending to show community of design between two or more persons to commit a crime, the acts and declarations of one of them done and made in furtherance of the common design are admissible in evidence in a prosecution against another of the conspirators for murder committed in pursuance and in furtherance of the conspiracy, and this is the rule though such acts and declarations were not done and made in the presence of the defendant on trial.

3. **SAME.** Where there is testimony of a conspiracy to commit a crime, and of its subsequent commission, the state may, in support and corroboration thereof, show any act, declaration, or conduct of the alleged conspirators intermediate of the conspiracy and the crime which apparently recognizes the existence of the conspiracy or reasonably indicates preparation or motive to commit the crime.

4. **EVIDENCE—Parties to Offenses—Commission by Another.** It is competent for the defendant to show, by any legal evidence, that some other person committed the crime charged, and that he had no participation in it. But this cannot be shown by testimony merely tending to show a possible motive on the part of another to commit the crime. The evidence offered must connect such other person with the fact; that is, some overt act on the part of another towards the commission of the crime itself. There must be evidence of acts or circumstances that tend clearly to point to another, rather than to the defendant, as the guilty party.

5. **HOMICIDE—Evidence—Commission by Another—Motive.** On a trial for murder, the defendant, for the purpose of showing that the stepfather of the victim may have committed the crime, and for the purpose of showing motive, offered to prove that he and his wife had separated, at which time he took with him the property of his wife; that he remained away from his wife until all the money had been squandered; that he then returned to her, because he hoped to profit by her children's estate; and that he knew the income from the property of his stepdaughter was $500 per month. The defendant also offered to prove that, for some time prior to the murder, the stepfather was intimate with a

woman other than his wife; this offer having been made upon the court sustaining objections to questions asked on the cross-examination of the stepfather as a witness for the state. All the evidence offered on this line was excluded. **Held,** not proper cross-examination, and that the evidence offered was properly excluded.

6.  **SAME.** The offer by the defendant, on trial for the murder of a child, to show that the stepfather of the child was the father of an illegitimate child, and that he intended to leave his wife and live with the mother of his illegitimate child, **held,** to have been properly excluded, since it would not reasonably tend to establish the defendant's innocence.

7.  **SAME.** Evidence offered to show possible motive on the part of the stepfather to take the lives of his stepchildren, without showing or offering to show some overt act on his part towards the commission of the crime charged against the defendant, is not admissible, since it would not reasonably tend to establish the defendant's innocence.

8.  **HOMICIDE—Evidence of Motive—Probative Effect.** The motives of men in committing a crime should be judged from the information upon which they act, rather than the accuracy of such information.

(Syllabus by the Court.)

*Appeal from District Court, Muskogee County;*
*R. P. de Graffenried, Judge.*

William M. Irvin, convicted of murder, appeals. Affirmed.

Plaintiff in error, William M. Irvin, jointly indicted with D. R. Allen, F. L. Martin, John Coombs, Jim Manuel, and Stout Ham, for the murder of Castella Sells, alleged to have been committed on or about the 23d of March, 1911, by discharging an explosive under a certain house in the town of Taft, was separately tried and convicted of murder, and his punishment assessed at imprisonment in the penitentiary at hard labor for the term of his natural life. After unsuccessful motions for new trial and in arrest of judgment, he was duly sentenced in accordance with the verdict, and from that judgment and sentence has appealed to this court.

The evidence shows that Castella Sells and Herbert Sells, children of tender years, lived with their mother, Priscilla Mackey, and their stepfather, Zeb Mackey, in a one-story four-room house in the town of Taft, an exclusive negro community, about ten

miles west of Muskogee. On the night of the 23d of March, 1911, an explosion occurred under the house, and the house was burned to the ground, and in it the bodies of Herbert Sells and Castella Sells were found the next morning. Hardy Sells, a Creek negro, was the father of Dewey, Birdie, Herbert, and Castella Sells. Dewey and Birdie died before their mother married Zeb Mackey.

The following is a substantial statement of the testimony taken at the trial:

Jim Whitaker, the first witness for the state, testified: That he lived near Mackey's place in Taft; knew Zeb Mackey, his wife, and Castella Sells and Herbert Sells during their lifetime. On the 23d of March, 1911, Mackey's house blew up between 2 and 3 o'clock in the morning; went over to the house and saw Mackey trying to get the two Sells children out; helped him; could not get the children out on account of the heat. Mackey and his wife were in their nightclothes. Saw Stout Ham. Cross-examination: Mackey had a very vicious dog.

Zeb Mackey testified: That he was the stepfather of Castella and Herbert Sells. That his house was about twenty feet square, and contained four rooms. That on the night it was burned the children occupied one room, and he and his wife the adjoining room. That the explosion occurred about 3 o'clock in the morning. The west side of the house was blown to pieces. That he and his wife got out of bed and found the children's bed pinned down by a part of the roof. That he hollered for help, and went to digging in the shingles, and Jim Whitaker came to help him. That he saw Stout Ham, who lived near by, standing in his door. That he could not raise the roof enough to get the children out. Worked until it got too hot. Found children next morning burned to death. Saw a hole in the ground near where the children's bed was. Drew a diagram of the place for the jury. On the 14th day of March, the defendant Irvin brought out some papers to their place which he said was an affidavit for Mrs. Mackey to sign that Hardy Sells was the father of the children. That Irvin told her that they had settled with an oil company, but that the oil company had

brought suit again, and he did not want the oil company to get an affidavit denying it. Cross-examination: Said he had separated once from his wife; had sold her allotment to F. L. Martin.

The defense offered to prove, by examination of Mackey, that the day following the day he had sold his wife's land he took the live stock and squandered it all and returned to her because she was the mother of these children; that he hoped to profit by their estate and had a motive for perpetrating the crime himself. The court sustained objection to this line of testimony and withdrew the testimony regarding the sale of the land and the separation. Mackey testified that he had shot one man, but this testimony was excluded; that he had helped Mr. Rutherford and Mr. Robertson to prosecute the case against the defendants, and had paid Robertson $2,000; and that an allowance of $5,000 had been made by the county court to aid in the prosecution; that the children owned the oil property.

The defense offered to show that the witness knew the income was $500 per month from Castella Sells' property and $200 per month from Herbert Sells' property; and the defense asked questions, over repeated objections, to show that Mackey tried to sell his stock; that Mackey had a child by the Perryman girl; that his wife knocked the Tevis girl down and beat her with a rock because of Mackey's relations with her. And after the ruling of the court, Mr. Kistler for the defense said, "I am going to get these questions in the record some way or other."

Priscilla Mackey, mother of the children, testified: That she was sleeping with Zeb at the time of the explosion, and corroborated her husband as to the circumstances surrounding the explosion and the death of the children.

The defense offered some line of questions about the homestead and the affair with the Tevis girl as in Zeb Mackey's cross-examination.

B. B. Roberts testified: That he saw the burned children and the condition of the house after the explosion; saw the body of the dog also.

J. C. Johnson testified: That he lived in Mexico City; formerly in Oklahoma, 1897-98. Never knew Hardy Sells. Met Doc Allen in Mexico City in February, 1909. Was a hotel solicitor for the Wadiola Hotel. Met Allen at the train, and Allen said, "Hello, Hardy," drew him off to one side; told him he (Allen) wanted him to represent Hardy Sells; that there was money in it if he would do so, and told him that two white men would come down with some papers. Gave Allen his card with name "J. C. Johnson" on it. In March or April, 1909, the defendant Irvin and a man named Martin came down. Irvin called him in and told him that Martin was his lawyer; brought a letter from Allen. Irvin said he wanted to see Johnson at the hotel; wanted witness to sign some papers. Witness told them he could be Hardy Sells if there was money in it. They gave him Sells' signature to practice. Went to Consul General's office and fixed up some papers. Came again in 1910 with some more papers. They gave him a suit of clothes and told him that he would get $5,000. Saw Irvin again in March, 1911, in Mexico City. Irvin said he had another paper to sign. Saw an account in a Mexican paper about the explosion. Told Irvin about it, and Irvin gave him a copy of the Muskogee paper. Saw Irvin the next day with Joe Depew out at witness' house. Irvin showed him some papers that witness had signed and exchanged addresses with him. Witness identified the letter from Allen about the two parties, and also the lease from which he had practiced the signature and four deeds, as follows: Exhibit B, deed to Wm. M. Irvin, May 11, 1909, "Hardy Sells, a single man," grantor, for $500; Exhibit E, same parties for $1,500; Exhibit F, "Hardy Sells, father of Dewey Sells," to Wm. Irvin, May 11, 1909, $500; Exhibit G, "Hardy Sells, a single man," to Wm. Irvin and John Coombs, allotment of Stella Sells, deceased, for $5,000, March 30, 1911. Witness further identified Doc Allen. Cross-examination: The defense introduced copy of the paper Irvin gave Johnson, and questioned him in detail regarding the transaction; requested that his testimony be excluded on the ground that no conspiracy had been shown between Irvin and

Allen or other parties; admitted that testimony about transactions in 1911 with Irvin might be competent, and that the other evidence tended only to show a conspiracy independent of the one alleged by the state.

W. Thornburg testified: That he had a conversation with the defendant Irvin in January, 1911, about the Hardy Sells lands. Irvin asked what he thought about the Hardy Sells allotment, and said it was in the name of Martin. Said there were oil wells in the Glenn Pool on the children's land, and that the only thing that stood between them, Irvin, and that allotment was the two children and the wife of Hardy Sells. Wanted witness to go to Mexico to identify Sells. Offered him $2,000 to do it. Said he was backed by Coombs. Said he was the only one who knew where Hardy Sells was; that Doc Allen had been down to identify him; said "the children were still living."

J. R. Fields testified: That about two years ago the defendant Irvin told him about running across a negro in Mexico who was supposed to have been drowned six or seven years ago, and who had a valuable allotment.

L. B. Eaton testified: That he had a conversation with the defendant Irvin in latter part of February, 1911. Irvin told him he had been in Mexico and made himself rich by buying the Hardy Sells allotment; said the heirs were in the way, and he could not get it in his possession until he got them out of the way. Morning after the explosion met Irvin in an elevator in Muskogee and told Irvin that he saw where some children out at Taft were blown up. Irvin took the paper and said, "Take me down to the ground." Previous to that, Irvin said he had been waiting for some old gentleman named Coombs to go down to Mexico with him. No cross-examination.

W. D. Cornelius testified: That he knew Doc Allen. Testified over objection that he had a conversation with Allen the latter part of February or the first of March, 1911, in which Allen asked him, "What would you think about somebody wanting you to kill somebody?" and, "Old man Irvin wants me to kill somebody." Defense objected to this testimony on the grounds that no evidence of conspiracy had been shown; that

it was not in furtherance of the purpose of the conspiracy; that no connection between Allen and Irvin respecting this crime had been shown; and that it was not admissible to prove a conspiracy. The court instructed the jury not to consider Cornelius' testimony.

Fred S. Cook testified: That he was special agent for the government, administrator of the estates of Castella and Herbert Sells. Identified Exhibits D, H, A, C, and B, papers taken from the defendant Irvin's grip at the time of his arrest. Went to Mexico City with Joe Depew after Irvin immediately following the explosion. Arrived Mexico City morning of the 30th day of March, 1911. Found Irvin at a hotel. Saw him at 8 o'clock the next morning, and went to where Irvin was eating. Asked Irvin if he had heard about the explosion. Irvin said, "Yes," it happened two days before he left. Told Irvin Disney had had Doc Allen arrested, and Irvin asked, "Did they arrest Doc Allen?" and, almost in the same breath, "Looks like they would have got out a warrant for me." Told him Joe Depew had one. Irvin said, "Don't talk so damned loud." As Depew came up by the hotel window, Irvin went into the toilet, saying, "I am going in here a minute," and went into the toilet. Depew and witness followed him, and Irvin was not there. Irvin did not come out the front way. They learned he had not gone up the elevator, but they went into his room, and found Irvin with his hat on putting some clothes into his grip. Irvin had $540. Irvin said he went there to get the deeds to land, the Herbert and Stella Sells allotments. Had the deeds pinned in his coat, and showed them to Cook. Witness examined the house at Taft the morning of the explosion. Found a bucket and the cylinder of a nickle plated revolver. Noticed the burned bed. Cross-examination: Found a hole in the ground eight or ten feet from the bucket. Saw the carcass of some kind of an animal that had been burned. Did not have extradition paper for Irvin. Irvin had a round-trip ticket. Got the letters of Irvin in his room after returning to Muskogee and the papers out of his grip. Filed a petition in the county court May

27, 1911, as administrator of the estate of Castella Sells, deceased, which the state offered then as state's Exhibit H.

J. A. McElwee testified: That he was conductor on Midland Valley Railway running through Taft. His best knowledge was that Irvin boarded his train at Taft in the morning within two or three days of the explosion, coming to Muskogee. Cross-examination: Had known Mr. Irvin. Did not remember of any other white man getting on the train that morning. Probably a week before that Irvin got on his train at Taft coming towards Muskogee.

Ben Curl testified: That he lived little bit south of Taft. Went to Mackey's place during the fire. Got the children out after the fire. Saw a big hole under the house. Found the bucket, and the bottom of the bucket in the hole. Cross-examination: Lived about a quarter of a mile from Mackey. Had to haul the bed off the children in order to get them out from under it. Admitted that he would help Mackey if he (Mackey) was in tight. Said that lawyers for the defense had been out to see him as well as officers.

A. L. J. Merriweather testified: That he lived at Boynton, Okla. Knew Doc Allen. Over objection, testified that he had talked with Doc Allen in the first part of May, 1910, and in July, 1910, about Hardy Sells. Doc Allen asked him if he knew Hardy Sells was living. Wanted witness to go identify Sells. Offered him $500 and expenses to go down there. In July, 1910, Doc Allen told him he had found the man, got what he wanted, and was not out as much money as he had offered witness. "Myself and old man Irvin found him." Cross-examination: Told Allen he believed Hardy Sells was dead; that he died in 1903 or 1904; that he had been at court ever since the trial had commenced.

John J. Jefferson, Jr., testified: That he saw Doc Allen in the early part of 1911, in Okmulgee. Over objection, testified that Doc Allen told him that they would make some money if he (Jefferson) would go to Kansas and identify Sells and get a deed. Cross-examination: Knew Hardy Sells, and told

Doc Allen that he knew Sells. Did not know whether Hardy was dead or not. Had been at court since Monday.

Bob Jackson testified. That he lived at Taft. Came to Muskogee the Monday before the explosion. On his way home, met man whom he identified as the defendant. Irvin asked him for a ride out to Taft. Irvin had a grip. On the way out, Irvin said he was a real estate dealer; had just come from Mexico; had a good deal in real estate on; and, if he got to make it, would make a great deal of money. Rode on out to Taft, and witness directed Irvin to a white man, Richardson, a ferryman. Cross-examination: Saw defendant about two weeks after the explosion on the streets of Muskogee, and recognized him. Some white man had afterwards asked him about the occurrence. Had frequently hauled other people to Taft. Had been in this country four years. Had not received any money for attending the trial. Irvin had a heavy grip of leather. Did not remember the kind of clothing he had on. Got into Taft about dark.

A. W. Richardson testified: That he was ferryman two miles northwest of Taft. Saw Irvin the second morning after the explosion about 7 or 8 o'clock at witness' home. Irvin says, "I found you at last," and that he had been looking for a ferryboat all night. Irvin asked the way to Haskell and talked of his land deals. Said he had a deal on between two parties that would bring him nearly $200,000. Cross-examination: Saw Irvin at the Katy Hotel in Muskogee some time in June or July, 1911. When saw him at the ferry, he had a brownish leather suit case; wore a black crusher hat; said he was hard up; wore black coat and vest, light shirt, blue overalls, which were dirty; and Irvin told him he had been lying out all night.

J. F. Wade testified: That he was an oil driller, and lived at Boynton within quarter of a mile of where Doc Allen lived. Used Independent power of the Joplin Company. Some time before the 16th day of March, 1911, lost something like a 25-pound box of dynamite. (Objected to, and motion made to exclude this testimony as incompetent, irrelevant, and immaterial.)

Mary Beasley testified: That she lived at Taft. Doc Allen came to her house a short time before the explosion, and wanted to stay all night. Over objection, she testified that Doc told her he was going to Mexico, but that he had a job to complete first which would bring him $2,000; that a couple of other fellows were in the job with him. Doc had a bundle with him which he left when he went out for a while. Witness examined it, and found what she thought were big sticks of candy broken up. This was about two weeks before the explosion. On cross-examination, and motion made to strike out testimony redirect: About half past 9 o'clock at night when Doc came. Cross-examination: Had met Doc once before. Did not know how Doc happened to come to her house.

Charlotte Quirt testified: That Doc Allen stayed all night at her house the night that he was at Mary Beasley's some time in March or February, 1911. Come from Beasley's about 11 o'clock that night. Cross-examination: Had not known Doc Allen. Did not pay much attention to him, but Doc told her his name.

Steve Franklin testified: That he knew both Doc Allen and the defendant Irvin. Met Irvin about noon on the 16th day of March, 1911, on the streets of Muskogee. Irvin asked him if he had seen Doc Allen, and told him to tell Doc Allen not to leave town until Irvin had seen him; that he (Irvin) had something for Doc to do first. Witness met Doc Allen and told him of Irvin's request. Doc said he knew what Irvin wanted; that Irvin had offered him $1,000 to kill somebody. About an hour afterwards, saw Allen and Irvin together in Borum's office in the Iowa building. That Irvin and Allen talked together for about 30 minutes in a back room. Witness did not hear what they said: Irvin went off, came back, and called Doc out, and said, "Do you think we had better let this black scoundrel in on the deal?" and Doc said, "No." They went out in the hall and talked; then left. (Motion to exclude foregoing testimony for the reason not made in the defendant's presence and for reasons assigned in objection to Cornelius' testimony.) Cross-examination: Had known Doc Allen seven or eight years. Met

Irvin in March, 1911. Did not hear what was said in the conversation. Had gone up to Warner's office where Borum was with Doc Allen. Joe Depew had found out about this testimony first and had questioned him.

Nathan Evers testified: That he lived in Taft. Found a grip with some dynamite in it in a pond just across the railroad from Stout Ham's house just a day after a big storm, some time after the explosion occurred.

R. C. Borum testified: That he remembered Doc Allen, Steve Franklin, and the defendant Irvin being in his office one afternoon latter part of February or first of March, 1911, some little time before the explosion. Franklin and Allen came first. Did not remember anything that was said. Irvin called Allen out and talked with him probably ten or fifteen minutes.

Fred S. Cook testified and identified three papers taken out of Irvin's grip on April 13, 1911, in Muskogee, certified copies of allotment plats of Herbert Sells, Alice Sells, and Stella Sells, dated March 21, 1910. No cross-examination.

Blanche Ashton testified: That she was clerk in charge of the certified records of the Dawes Commission. In March, 1911, she sold certified copies of the rolls of the Sells children to Wm. M. Irvin, and on March 21, 1910, she sold state's Exhibits X, J, and I, certified copies of the plats of the allotments of Castella, Herbert, and Alice Sells, to Irvin. No cross-examination.

Phillis Manuel testified: That she lived in Taft at the time of the explosion, and over objection testified that she saw John Norwood at her home the night of the explosion. That Norwood came to her house and engaged a room. That about 9 o'clock he went uptown to get a lunch and returned some time before the explosion. Cross-examination: Got the lunch for a lady. That he came right back with the lunch. Redirect: Her sister, Katie Manuel, Hezekiah Driver, and Maggie Felix were there. Witness was sick and did not pay much attention to Norwood's movements when he came or afterwards.

Hezekiah Driver testified: That he lived at Taft on the night of the explosion. Was at Phillis Manuel's house and saw John Norwood there. Over objection, testified that Norwood went uptown after the others had gone to bed after something to eat for a woman. Was not gone "so awful long before he got back." Witness saw Norwood when the house was burning. Cross-examination: Witness was cutting wood when the explosion occurred, at the request of his sister-in-law. Norwood came back as he was out at the woodpile. That Mackey's house is closer to Manuel's than the restaurant, and it would be a whole lot out of the way to go to Mackey's house from the restaurant on the way to Manuel's house.

J. B. Crow testified: That he was laundryman in Muskogee. Irvin came into the laundry day after the explosion. Said he was going away and wanted to pay his bill. Had a pretty good roll of money. Cross-examination: Did not remember the time of day, and was asked to get his record to show the exact day. Produced book showing entry of March 24, 1911.

Bob Edwards testified: That he lived in Muskogee. Knew Doc Allen. Met Doc Allen next morning after the explosion a mile or more from Taft, between 9 and 10 o'clock. Talked to him about the explosion. Doc said he understood they were accusing him (Allen), and that his best plan was to get out of the country, and that he was going to leave. (Motion to strike testimony on the ground that testimony was to conversation made after the explosion, etc.) Cross-examination: Was a teamster, going to Boynton on horseback that day. Known Doc Allen about five years. Doc was riding a gray horse, about a mile and one-half south of Taft, going in the direction of the ferry. Had heard of the explosion on his way to Taft.

C. E. McCulley testified: That he was formerly passenger agent at the Katy. Sold Irvin a ticket to Mexico City in January, 1909, and in March or April, 1909, first time he said he had a deal on in Mexico. A week or ten days before the explosion, Irvin approached witness, and said he wished witness was passenger agent again; that he wanted a ticket to Mexico City,

and did not want anybody to know where he was going, and wanted to know if witness would get the ticket for him. Irvin said that he had made over $200,000 in the real estate business. First time he bought a ticket was with a colored man who signed the ticket as Doc Allen. The second time a Mr. Martin was with him. Cross-examination: Defendant Irvin bought two tickets the first time, and was positive he bought two the next time. Worked until February 15, 1910, as passenger agent. No other tickets sold to Mexico City at that time.

C. C. Scott testified: That he was assistant ticket agent at the Katy. Some time before the explosion, Irvin asked about rates to Mexico City; said he did not wish for anybody to know where he was going when he purchased his ticket. Cross-examination: Irvin bought round-trip ticket. Witness could not fix the exact date. Agreed to examine records and ascertain.

Joe Depew testified: That he was deputy sheriff. Had warrant for Irvin. Served it in Mexico City. Found Irvin at hotel. Told him he had a warrant for this murder. Irvin asked to see it, and said, "All right." Walked around to the American Consul General's office and got the deeds. At 3 o'clock went out to Johnson's house. On way out, Irvin gave him a deed and asked him to ask Johnson if he had signed that deed and every other instrument his signature was on. Saw a contract. Saw Irvin give Mrs. Johnson and the girl some American money. Cross-examination: Left Muskogee on the 27th day of March, 1911, with Fred Cook. First saw Irvin in his room in the hotel, and served warrant there. Had no extradition papers. Irvin made no objection to coming back. Had heard there was $1,000 reward offered by the county court through Fred Cook. Searched Irvin's room and grip for papers while Irvin was in jail. Made three trips to Mexico; one in March after Irvin, one in October, and one in November, 1911. Last time brought back Johnson and his wife and the whole family. Took them to Ft. Smith, Ark., in charge of Fred Cook and J. W. Robinson, a detective. Gave Johnson some letters in October from Disney. These letters granted Johnson immunity,

promised safe return to Mexico, that Johnson would not return to Muskogee until he had a letter from the American Consul guaranteeing a safe return. Witness paid Johnson's expenses and gave him about $50 for expenses altogether. Told Johnson what fees witnesses usually got. That Fred Cook furnished the money for the expenses. That Irvin requested him in Mexico City not to ask Johnson too many questions; that he might scare Johnson, and Irvin did not want him to run off.

Ralph A. Patterson testified: That he was a banker. The defendant Irvin left papers with him on his return from Mexico in March, 1911, and $540 in money. That the papers and money were drawn out by Messrs. Coombs and Noffsinger.

John Norwood testified: That he knew Doc Allen for a little more than a year. That he was living in Taft on the 23d day of March, 1911; had been in jail since June 25th, on a charge of forgery. Saw Doc Allen and Sam Lowe the night of the 22d of March, 1911, in Taft. Had had a conversation with Sam Lowe about the 8th day of March and with Allen Lowe and Doc Allen together about the 12th or 14th. Testified over objection that he had had a conversation with Allen about the 14th day of March. Saw Doc Allen and Sam Lowe together. Walked up to see if Allen was the fellow Lowe had told him about. Allen stopped talking. Lowe told Allen witness was the fellow he had been talking about, and said witness was all right. Went into the depot, and all took a drink. Allen said:

"I have a job I want you to help us through. I want you to help watch. Everything is arranged. There is money in it for all three of us if you go ahead and keep your mouth shut."

Said there was $5,000 to be furnished by a Muskogee man named Irvin; that he would let them know the night he would be in Taft. Said:

"We want to kill them all if we can, but, if we can get the children and the woman, we will be all right, but we want to kill them all if we can. We want to blow it up and burn it up. We have enough dynamite and powder."

Lowe told how he was going to put coal oil on top of the powder to be ignited by the explosion. Allen said he would leave word with Lowe. Saturday before the explosion, Lowe told him to meet them about 11 o'clock Wednesday night at Ford's Gin. Ford's Gin was northeast of Mackey's and Stout Ham's houses. Met Doc Allen and Sam Lowe there on Wednesday night near the appointed time. Allen said, "Everything is all right." Witness saw a bucket which Allen said was fixed all right. Witness said bucket in evidence resembled bucket they had. Allen stepped to the fence, and Norwood examined the bucket, found coal oil can, and powder can filled with black powder, and six or eight sticks of dynamite. Allen came back and said:

"We are ready to go. We are going to join on the west side of town and wait until it gets a little later."

Told witness to go up about Mackey's house and watch; that Sam Lowe and Allen would go in and take care of everything. Witness claimed he left to get a lunch and went back to Phillis Manuel's house and went to bed, and was there when explosion occurred. Did not remember what time it was. That the fuse in the bucket looked to be 50 feet long. Saw the dead children the next morning about 7 or 8 o'clock. Cross-examination: Lowe first approached him. Said he wanted the witness to help him pull off a deal and explained what it was. Had known Mackey since February. Lowe said he knew where the children and their mother slept and would fix it so the dynamite would be right under them. Saw Lowe once after the explosion. Lowe told him they had not received the money yet. Advised Norwood to leave the country. Had worked with Lowe before, and had used dynamite. Heard nobody's name mentioned but Irvin's. Was brought back from Omaha, Neb. Said he had been indicted on two charges before Justice Wheeler, murder of Herbert Sells and Castella Sells. Was brought back on forgery charge. Told the sheriff and Mr. Cook and Rutherford at the jail; did not tell them about Sam Lowe until long time. That he had not been promised anything to testify; that had not been threatened or put through the third degree, or

did not know what would be done with him. Did not hear the dog. Zeb Mackey was not at the cotton gin that night. They had always told him that all they wanted him to tell was the truth.

The court excluded and directed the jury not to consider for any purpose the following testimony:

Mary Beasley's testimony of Doc Allen's telling her he had a job to pull off for a consideration and would then go to Mexico. Bob Edward's testimony as to Doc Allen's saying that he (Allen) was being suspected of the crime; that he thought it best to leave the country, and would leave. Steve Franklin's testimony that Doc Allen wanted Allen to kill somebody for $1,000.

Joe Depew, recalled by the state, testified: That he received a little telescope containing dynamite from a constable at Taft. Turned it over to a hardware company. That had since tried to get the dynamite, but understood it was dumped out with some trash by men who cleaned up the place. That telescope contained twenty sticks made by Independent Powder Company at Joplin. Cross-examination: Telescope contained a Sunday Chicago Examiner newspaper of March 4, 1911. Suit case was about two-thirds full, and had been soaked in water, and was soft when found. Took dynamite to hardware magazine because witness did not know much about it.

### FOR THE DEFENSE.

J. H. Maxey testified: That he was a member of the House of Representatives. Knew the defendant Irvin seventeen years. That Irvin had good reputation as an honest, upright, and law-abiding citizen. Cross-examination: Had heard Irvin had killed a Chinaman once. That believed Irvin was an officer at the time.

Dr. F. B. Fite testified: That the defendant Irvin had a good reputation.

W. A. Crosby testified: That the defendant Irvin had a good reputation.

John F. Chandler testified: That, last of 1910 or first of 1911, the defendant Irvin asked him if he would go down to Mexico and identify Hardy Sells.

H. B. Spaulding testified: That, in latter part of year 1910, the defendant Irvin offered to pay his expenses to go to Mexico to identify Sells. That Irvin said, "I guess you thought he was dead, but I have found him." Irvin said he had bought Sells' land and that it was worth a lot of money.

W. R. Robison testified: That the defendant Irvin asked him to go down to identify Sells and offered to pay his expenses.

R. P. De Graffenried testified: That he had known the defendant Irvin twenty years. Irvin told him, after the first trip to Mexico, that he had found Hardy Sells and had a deed to his land.

B. B. Roberts testified: That he had measured the house during the trial at the suggestion of some man. His measurements were made eleven months after the explosion, and showed some little discrepancy from what had been testified to by some of the state's witnesses.

Jim Harrison testified: That he was member of board of health at Taft. Buried a dog found under the southeast corner of the dining room of Mackey's house. Underside of dog was not burned.

Roxie Thomas testified: That possibly she stayed at Mackey's house for three weeks before the explosion.

Lou Janey Perryman testified: That she knew Zeb Mackey. Defense offered to prove that Zeb Mackey was the father of her child born the day before the explosion; that he had promised to get hold of some money and leave the country with her —for the purpose of proving motive in Mackey to commit the crime.

Priscilla Mackey, called by the defense, testified: That J. C. Johnson was not Hardy Sells. Had last seen Hardy Sells in 1902. That Birdie Sells died May 26, 1899. That Castella and Herbert Sells, the two murdered children, lived with her

at the time Sells left. Defense offered to prove by this witness that she sold the homestead for $1,000 a short time before the explosion, and that Mackey took all the money and live stock and lived separate from her until he had squandered it.

Lucy Thomas testified: That she knew the Mackeys and their family. Defense offered to prove by this witness that Mackey had told her that he intended to get a lot of money, to leave his wife, and to get a more sensible wife.

F. L. Martin testified: That he was one of the defendants jointly charged with the defendant Irvin. Had known Irvin six or seven years and Doc Allen for five years. In January or February, 1909, Irvin told him that Doc Allen had found Hardy Sells living in Mexico City, and several times asked him to go there with him. That they went to Mexico City, and Irvin called Johnson up to the carriage and made arrangements with Johnson to meet them at the hotel. Johnson came, and they questioned him to find if he was Hardy Sells, and he believed that he was. That they had Johnson write the name of Hardy Sells to test him. Wrote name with pencil first, and they tested the signature with one on a lease that they had. Did not show him the lease. Questioned him further, and made him write his name twice with a pen for comparison. They stayed seven or eight days in Mexico City, and it was three days before they got a deed. The Vice Consul General who took acknowledgment asked Irvin if he knew J. C. Johnson. Irvin said, "Yes." Witness paid Irvin $1,200 and saw Irvin pay Johnson $500 when the deal was made. Witness bought the tickets to Mexico. Obtained one deed to the Dewey Sells allotment and two deeds to the Hardy Sells allotment. Sold the land to a man named Davis in Nebraska, and got a quit-claim from Priscilla Mackey. Afterwards, Irvin told him that there was another dead child, but witness would not furnish him the money. John Coombs, Irvin, and witness each put up a third of the money. That they went down again to Mexico City. Witness identified deed and contract from Hardy Sells, delivered in Mexico City, July 19, 1910, to Irvin, Coombs, and witness for $5,000 consideration. Had

not talked to Doc Allen about it. Doc came to him two or three times afterwards and wanted some money, and witness paid him $50. Did not know anything about the defendant Irvin's trip in March, 1911. Was in Kansas City when the explosion occurred. Denied all knowledge of the explosion or any understanding whatever in regard to it. Did not know Norwood. Did not suspect Johnson was not Hardy Sells. Told Johnson if he was not he did not want Johnson to sign the deed. Witness identified letters to Noffsinger regarding suit brought on Sells' land, regarding depositions of Hardy Sells in Mexico, and other matters about the title to Birdie Sells' allotment. Witness also identified letters between him and Irvin regarding trips, and explained in detail about the letters and certain references in them. Cross-examination: Testified that in his application for bail he said he had not had any letters from Irvin for several months. Admitted giving Johnson a suit of clothes, and admitted that he knew if Johnson were not Hardy Sells the deed would be valueless. That he had sold the Hardy Sells allotment. That he had made no special inquiry as to who would inherit, and that the opinions of the lawyers were diverse.

Asa E. Ramsey testified: That he was cashier of First National Bank of Muskogee in year 1909. Bank issued a letter of credit to F. L. Martin for $1,500 April 24, 1909.

S. C. Sessney testified: That he saw the defendant Irvin in his office in Muskogee about 9 o'clock on the morning of March 24, 1911. That John Coombs was there. Cross-examination: Relative of Coombs. That he took the deed to the registrar's office in Okmulgee.

W. S. Coombs testified: That he was a farmer near Vian. Saw defendant Irvin at 8 o'clock on morning of the 23d of March, 1911, and saw him with John Coombs between 5 and 6 o'clock in the afternoon in Irvin's office.

The defendant, Wm. M. Irvin, as a witness on his own behalf, testified: That he was 52 years old. In real estate business. Knew John Coombs and Doc Allen. Did not know there was such a fellow as Norwood, Stout Ham, or Seth Lowe. First

met Doc Allen in November, 1908, when Doc tried to sell him 30 acres of land.  In January, 1909, that Doc told him for the first time about a Creek negro who had an allotment who was a fugitive from justice, and again that the negro was Hardy Sells. That he purchased the tickets for Martin and himself to go. Went to Mexico City, and picked Johnson out of three or four negroes 40 or 50 feet from the hack.  Made an engagement with him at the hotel.  Questioned him closely, and was convinced he was Hardy Sells.  Witness denied that he had helped perpetrate a forgery, and declared that he told Johnson several times that he did not want Johnson to sign deeds if he were not Hardy Sells.  That he paid $1,250 for the first deed. That he never had any talk with McCulley about going down to Mexico.  Never bought a ticket for Doc Allen.  Denied Thornburg's testimony.  Denied ever talking with anybody about blowing up these children at Taft or contemplating it in any way.  Denied ever seeing the ferryman or negro who testified that he had ridden out to Taft with Irvin.  The last time he was in Taft was four or five weeks before the explosion, when he went out to get the affidavit.  That he got the rolls from the Dawes Commission on advice of his attorney as evidence of the two children Hardy Sells had told him about.  Was making preparations several months before the explosion to go down to Mexico to have Hardy Sells identified, and went down on the 24th.  Identified an instrument from Hardy Sells, March 30, 1911, nominating Irvin his agent.  And defense introduced two instruments of July 11, 1902, from real Hardy Sells for comparison of signature.  Cross-examination:  Admitted he was taking a chance on the Birdie Sells land when he went to Mexico, and that he paid $1,200 for that chance.  Agreed to pay Johnson $5,000.  That McElwee was mistaken about witness being at Taft.  Admitted that he had taken a chattel mortgage from the recorder's office without permission.  That had had only one deal with Doc Allen.  Denied Cook's statement about witness being surprised that they had not arrested him.  That he was not packing his grip when arrested and was not trying to get

away. Said witness Eaton was mistaken about his testimony. Further cross-examination, testified: That he did not know a thing in the world about a decision of the United States court and the county court that Hardy Sells and Stella Sells had a one-half interest in the Birdie Sells land. That he did not know Herbert and Stella Sells were drawing and inheriting the royalty from the Birdie Sells land.

George S. Ramsey testified: That he was one of the attorneys for the defendant Irvin, and that he had frequently given Irvin some legal advice as to inheritance and decisions of the courts upon this question.

W. W. Noffsinger testified: That he was one of the attorneys for the defendant. That he had talked to Irvin regarding the laws of descent.

Will Kahl. Defense offered to prove by this witness that, the Saturday before the explosion, Mackey offered to sell witness all his live stock at less than 50 cents on the dollar.

Milton Ragsdale testified: That he had grocery store in Taft. Monday or Tuesday before the explosion, Mackey sent to Muskogee by him for some giant powder and a nickle's worth of fuse. Cross-examination: That he did not get it because he could not find it.

E. H. Sheets testified: That he was an oil producer. Had been in the oil business twenty-two years; had had experience with dynamite and other explosives. That, if six or eight sticks of dynamite were in a bucket and exploded, the bucket would be battered to pieces. That it would not leave much of the house in question. Cross-examination. That a fire might melt the bottom out of a bucket. That he had known Coombs for three years, and that he had drilled wells for Coombs and Jasper.

Mrs. W. M. Hutchings testified: That defendant Irvin roomed at her house in Muskogee. That he was at her house the night before the explosion and on the following night, the 24th. Cross-examination: Did not see him come in Wednesday night.

T. J. Miller testified: That he saw the defendant Irvin the morning of the 24th, about 9 o'clock, at the Atlanta Hotel in Muskogee. Cross-examination: That Coombs and Sessney owned the hotel. That nothing particularly or independently caused him to remember.

W. M. Hutchings testified: That the defendant Irvin had been staying at his house for about three years. That Irvin went to Mexico on Friday night following the explosion. That Irvin was at his house Wednesday and Thursday nights. Cross-examination: That he used to use Irvin for an alarm clock. Irvin had a pass-key to the house.

Lulu Lee testified: That she was a daughter of Mrs. W. M. Hutchings. Saw Irvin at 11 o'clock Wednesday night, March 22d. Kept a diary from which she refreshed her memory. Cross-examination: That her testimony was largely based upon Irvin's custom, and state offered her diary in evidence.

Minnie Ford testified: That she was stenographer for Ramsey & Thomas. The defendant Irvin dictated an instrument to her in her office the morning of March 24th, and in the afternoon also.

W. T. Wisdom testified: That he was president of the Muskogee County State Bank. Loaned John Coombs $3,000 March 24, 1911. Cross-examination: March 10, 1911, showed a balance of $1,575 in favor of Coombs. March 14, 1911, $275.35 red, and an overdraft on each day thereafter up to and including the 24th day of March, 1911, and showed a deposit of $1,000 credit and a check for $25 on the 24th day of March, 1911.

The defense offered in evidence and introduced Exhibit H, joint petition of Fred S. Cook, administrator, and Priscilla Mackey, for authority to institute suit, defend actions, and incur expenses in clearing title and making investigations in connection with the murder of Castella Sells and Herbert Sells, which petition set out, among others, the purported deeds from Hardy Sells to Martin, Irvin, and Coombs, and to their grantees, and, on page 1008, introduced an order of the county court allowing $5,000 for the procurement of testimony in the prosecutions.

Agreed that no indictment or information was filed in the district court against John Norwood, and that an information was filed in the court against him, charging him with the murder of Castella Sells and Herbert Sells; that he was used as a witness in the trial of Sam Lowe, one of the codefendants, before the justice of the peace; that no warrant had ever been served on him charging him with murder; and that there had been no information or indictment charging him with forgery.

## STATE'S REBUTTAL.

J. H. Kennedy testified: That a short time before the explosion he saw the defendant Irvin in the barber shop with a big roll of money.

W. H. Beall testified: That about a week before the explosion witness saw the defendant Irvin in his barber shop with a big roll of money, and that Irvin said he had a big land deal on.

J. F. Ledbetter testified: That he had a conversation with the defendant Irvin the Sunday before the explosion, and he asked him if he knew Hardy Sells and could identify him; that he had a big land deal on, several hundred thousand dollars; that he told Irvin that he did not believe he could identify Sells; and that Irvin told him he did not want to say anything about the conversation.

George Brown testified: That a short time before the explosion at Taft he saw the defendant Irvin and Doc Allen driving down Second street in Muskogee together, probably four or five days. (Defendant had denied being with Doc Allen at that time.)

L. G. Disney testified: That he was clerk of the United States Circuit Court, Eastern district of Oklahoma. Court sustained objection to introduction of records of the case of the guardianship of Stella and Herbert Sells in which a decree was entered between T. H. Martin, their guardian, and the Gypsy Oil Company, in regard to land belonging to Birdie Sells, because the defendant testified that he knew nothing about that decree.

## Exhibits.

A. Identified by witness Zeb Mackey. Affidavit of Priscilla Mackey that she married Hardy Sells; had four children, Dewey, Herbert, Birdie, and Castella; that Birdie died May 26, 1899.

B. Identified by witness J. C. Johnson. Letter from Doc Allen to Johnson about Martin and Irvin, dated April 9, 1909.

C. Identified by witness Johnson, dated September 16, 1902. Lease from Hardy Sells to A. M. Cowgill.

D. Identified by witness Johnson. Warranty deed from Hardy Sells to Wm. M. Irvin, dated May 11, 1909, acknowledged before Deputy Consul General in Mexico City.

E. Identified by witness Johnson. Warranty deed from Hardy Sells to Wm. M. Irvin, dated May 11, 1909, acknowledged before Deputy Consul General in Mexico City.

F. Identified by witness Johnson. Warranty deed from Hardy Sells, "father of Dewey Sells," to Wm. M. Irvin, dated May 11, 1909, acknowledged before Deputy Consul General in Mexico City.

G. Identified by witness Johnson. Warranty deed from Hardy Sells, "a single man," to Wm. Irvin and John Coombs, allotment of Stella Sells, dated March 30, 1911, acknowledged before Consul General in Mexico City. Filed for record April 7, 1911.

H. Identified by witness Fred S. Cook. Joint petition of Fred S. Cook, administrator, and Priscilla Mackey, for authority to institute suit, defend action, and incur expenses in clearing title and making investigations in connection with the murder of Herbert Sells and Castella Sells.

I. Identified by witness Fred S. Cook. Certified copy of official allotment plat of Herbert Sells, dated March 21, 1910.

J. Identified by witness Fred S. Cook. Certified copy of the official allotment plat of Alice Sells, dated March 21, 1910.

K. Identified by witness Fred S. Cook. Certified copy of the official allotment plat of Castella Sells, dated March 21, 1910.

Y. c-m. Identified by state's witness Johnson and by defendant's witness F. L. Martin, p. 653. Warranty deed, Hardy Sells to Wm. M. Irvin, F. L. Martin, and John Coombs, dated July 18, 1910, acknowledged before Consul General in Mexico City.

X. Identified by state's witness J. C. Johnson, and by F. L. Martin, for the defense. Contract, Hardy Sells and Wm. Irvin, F. L. Martin, and John Coombs, dated July 18, 1910, acknowledged before Consul General in Mexico City. Birdie Sells allotment.

12. Identified by the defendant Irvin. Certified copy of roll of Herbert Sells and Dewey Sells, dated March 7, 1911.

13. Identified by the defendant Irvin. Certified copy of roll of Stella Sells and Birdie Sells, dated March 7, 1911.

14. Identified by the defendant Irvin. Instrument by Hardy Sells appointing Wm. M. Irvin agent and attorney in regard to the estate of Stella Sells, deceased, dated March 30, 1911, acknowledged before Consul General in Mexico City.

The record is voluminous. The transcript of the testimony taken at the trial contains more than 1,000 typewritten pages. The foregoing summary of the same is sufficient for the purpose of this opinion.

*W. W. Noffsinger* and *C. L. Thomas*, for plaintiff in error.

The Attorney General and *W. E. Disney*, Co. Atty., and *W. W. Cotton* (*Francis Stewart*, of counsel), for the State.

DOYLE P. J. (after stating the facts as above). Plaintiff in error has assigned numerous errors, and the questions presented have been ably discussed by counsel on both sides, both orally and in the briefs. These questions will be discussed in the order in which they are presented. The principal proposition presented arises upon the rulings of the court on questions of evidence.

First. It is contended that the court erred in permitting the witness Norwood to testify to a conversation had with Doc (D. R.) Allen, one of the defendants, about the time of the murder, to the effect that there was $5,000 in it to be furnished

by a Muskogee man named Irvin, if they would kill the children and their mother by blowing up and burning the house with dynamite, powder, and coal oil; and in permitting the witness Merriweather to testify to certain conversations with Doc Allen, in which conversations Allen stated that "He knew where Hardy Sells was," and wanted witness to go to Mexico and identify that party as Hardy Sells, and there would be in it for witness "expenses and $500"; and in permitting the witness Jefferson to testify to a conversation with Doc Allen, in which Allen solicited witness to go to Kansas and identify Hardy Sells, and in which Allen said, "If you identify him for Hardy, we can get a deed and make some money"—because the defendant Irvin was not present at such conversations, and because the evidence is not sufficient to show a conspiracy between the defendant Irvin, Doc Allen, and others, and that said testimony was therefore merely hearsay.

The testimony objected to was admitted by the court under the theory of the state that the defendant Irvin had conspired with his codefendants, F. L. Martin, John Coombs, and others, to procure by fraud and forgery the allotted lands of the children of Hardy Sells, including the lands of the murdered children, and that the murder of Castella Sells, as charged in the information, was an incident to that conspiracy.

Upon the theory of the state, we think the evidence objected to was properly admitted.

In the case of *Starr v. State,* 5 Okla. Cr. 440, 115 Pac. 356, it is said:

"The rule of law applicable to questions of this kind is well settled. In a trial for murder, any evidence which fairly tends to prove a conspiracy between persons to commit the murder and the motive for the murder is admissible, although not tending directly to prove the murder charged in all cases, where such testimony tends to corroborate the testimony tending directly to prove the murder charged. It is not necessary that the prosecution establish beyond peradventure that the acts, declarations, or conduct of the alleged conspirators were based upon the conspiracy or in reference to the crime charged. It is sufficient if they harmonize with and tend to confirm the charge of conspiracy,

or show motive for the crime. If such acts, declarations, or conduct of the alleged conspirators could not be shown, unless the motive therefor, or the connection between the same and the crime, were made undisputably clear, the range of inquiry would be very limited. It is sufficient that such acts, declarations, and conduct have an apparent or probable connection with the crime. The general rule is that, where there is evidence of conspiracy to commit a crime, and of its subsequent commission, the prosecution may in support and corroboration thereof show acts, declarations, or conduct of the alleged conspirators intermediate of the conspiracy and the crime which apparently recognizes the existence of the conspiracy, or reasonably indicates preparation or motive to commit the crime."

Says Wharton:

"Where a conspiracy is shown to exist, which is usually inductively from circumstances, then the declarations of one conspirator in furtherance of the common design, as long as the conspiracy continues, are admissible against his associates, though made in the absence of the latter. The least degree of concert or collusion between the parties to an illegal transaction makes the act of one the act of all." (2 Wharton's Law of Evd. par. 1205.)

"Slight evidence of collusion is all that is required." (2 Rice on Evd. 865, par. 333; 1 Greenleaf on Evd. [13th Ed.] par. 111; *Anarchist's Case,* 122 Ill. 1, 12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320.)

Where there is evidence tending to show community of design between two or more persons for the performance of an unlawful act, the actions, and conduct, and statements of one of them are admissible in evidence in a prosecution against another of the conspirators for homicide alleged to have resulted from the conspiracy, and this is the rule though such acts were not done, or though such statements or declarations were not made, in the presence of the person against whom they were used.

See note and cases collated in *People v. Lawrence,* 68 L. R. A. 220.

A conspiracy can seldom be established by direct and positive evidence. It is, from the nature of the case, only evidence of circumstances tending to show conspiracy which ordinarily can

be adduced. If there is testimony tending to show that the defendants pursued by their acts the same unlawful object, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, a sufficient and proper foundation has been laid for the admission of the acts and declarations of other conspirators made and done while the conspiracy was continuing in furtherance of the common design. In the case at bar, the fact that Castella Sells was murdered by some person or persons who hoped to gain by her death is undisputed. It was not claimed by the state that the defendant Irvin committed the act which caused the death of Castella Sells, but it was claimed that her death was caused by the criminal agency of the defendant acting with others, and that the motive for the murder of Herbert and Castella Sells was to secure their interests in very valuable oil lands.

The testimony of J. C. Johnson, who lived in Mexico City, was that Doc Allen came there in 1909, and asked him to impersonate Hardy Sells, and that he told the defendants Irvin and Martin, who came with Allen, that he could be Hardy Sells if there was enough money in it; that they gave him a lease which had the genuine signature of Hardy Sells for him to use in practicing how to sign the name of Hardy Sells; and that he executed deeds, one purporting to convey land in Okmulgee county, Okla., another purporting to convey lands in Muskogee county, Okla., also a deed from "Hardy Sells, father of Dewey Sells," purporting to convey land in Okmulgee county, Okla., by forging the name of Hardy Sells to said deeds, which purported to convey lands described therein to the defendant Irvin; that Allen, Irvin, and Martin returned to Mexico City in 1910, and at that time he forged the name of Hardy Sells to a warranty deed, purporting to convey the interest of Hardy Sells, as the father of Birdie Sells, deceased, in her allotment in the Creek Nation, to Wm. M. Irvin, F. L. Martin, and John Coombs, of Muskogee; and that at that time he forged the name of Hardy Sells to the supplemental contract, the same being acknowledged before the Consul General of the United States at Mexico City,

and in favor of the defendants Irvin, Martin, and Coombs, which contract contains the following recital:

"Whereas, it was my intention at the time of executing said warranty deed, and now, to have the same relate back and have all the covenants and warranties therein relate back and to be of full force and effect as of the 26th day of April, 1906" —and further assigning to said parties all outstanding rentals, both agricultural and mining, and all choses in action that might have accrued to Hardy Sells.

In further corroboration of J. C. Johnson's testimony, and as independent facts connecting the defendant Irvin with the conspiracy and the crime, was his possession of certified copies of the official allotment plats, showing the allotments of children of Hardy Sells; also, evidence that the defendant Irvin, shortly before the explosion, inquired about rates to Mexico City; that shortly before the explosion he went to Taft carrying a heavy suit case, and that he was seen near there the morning following the explosion; also the testimony of the witness Thornburg, to the effect that in January, 1911, the defendant Irvin stated to him "that only two things stood between him and the Sells allotments, the two children and the wife of Hardy Sells," and the witness Eaton's testimony, to the effect that the defendant Irvin told him in February "that he could not get possession of the Sells land until he got the heirs out of the way." The defendant Irvin's frequent association with Doc Allen from the time of their first visit to Mexico City in 1909, until the time of the murder was proved by numerous witnesses. The fact that all the money used by Irvin in the transactions with J. C. Johnson, acting as Hardy Sells, was furnished by the defendants F. L. Martin and John Coombs, is undisputed. When the rest of the evidence is considered, it is apparent that the testimony of the witness Johnson is abundantly corroborated by facts and circumstances which go to prove the conspiracy and common design to secure by forgery and fraud the lands of Hardy Sells, and of his children. It follows that the acts and declarations of Doc Allen, a co-conspirator, in furtherance of the common design, were admissible against the defendant Irvin, although done

and made in his absence. *Burns v. State,* 8 Okla. Cr. 554, 129 Pac. 657; *Bowes v. State,* 8 Okla. Cr. 277, 127 Pac. 883; *Terry v. State,* 7 Okla. Cr. 430, 122 Pac. 559; *Holmes v. State,* 6 Okla. Cr. 541, 119 Pac. 430, 120 Pac. 300; *Wilson v. State,* 5 Okla. Cr. 649, 115 Pac. 819; *Stockton v. State,* 5 Okla. Cr. 310, 114 Pac. 626; *Starr v. State,* 5 Okla. Cr. 441, 115 Pac. 356; *Price v. State,* 1 Okla. Cr. 358, 98 Pac. 447.

The state may prove the acts and declarations of a co-conspirator done and made in the absence of others before proving the conspiracy, provided such proof is afterwards made. The order of the testimony is largely in the discretion of the trial court. Nor is it material as to the admissibility of acts and declarations of the conspirators, in furtherance of its purpose and object, that the conspiracy should be charged in the information.

It is further contended that the court erred in refusing to permit the defendant to introduce certain evidence to show motive and opportunity of other persons to commit the crime. On the cross-examination of the state's witness Zeb Mackey, he stated that, when he married Hardy Sells' widow, she had her own allotment and that they sold her allotment to F. L. Martin, one of the defendants, and that he left his wife about that time. Several other questions along this line were asked, to which objections were sustained as not proper cross-examination. Thereupon the defendant made the following offer of proof:

"That when Mackey and his wife had sold her land, he took the money and left his wife, and took with him the live stock from the premises, and remained away from his wife until all the money had been used and squandered, and that he then returned to her because she was the mother of those children, and that he hoped to profit by their estate, and had a motive for perpetrating this crime himself."

The court sustained the objection, and directed the jury to disregard Mackey's testimony regarding the sale of Mrs. Mackey's land, and their separation.

The defendant further offered to prove that Mackey knew the income was $500 per month from Castella Sells' property,

and $200 per month from Herbert Sells' property. An objection that it was immaterial and not proper cross-examination was sustained.

The following questions were also propounded to the witness, and objections thereto sustained on the ground that it was not proper cross-examination:

"Q. Is it not a fact that for some time prior to this explosion that you were intimate with the Perryman girl and having intercourse with her?

"Q. Is it not a fact that you were making arrangements to leave your wife, blow up these children, get the money, and take this Perryman girl and leave the country?

"Q. Is it not a fact, that a few months before this explosion, your wife, Priscilla Mackey, knocked that Tevis girl down there at the depot and beat her with a rock because of your relationship with the Tevis girl?"

The questions were severally objected to as incompetent, irrelevant and immaterial, and not proper cross-examination. That the rulings of the trial court in rejecting the proffered testimony, and in sustaining the objections made, were manifestly correct, is hardly open to controversy.

While it is competent for the defendant to show, by any legal evidence, that some other person committed the crime with which he is charged, and that he is innocent of any participation in it, such evidence must tend to connect such other person with the commission of the crime charged. An examination of the authorities will show that it is generally held that evidence which could have no further effect than to cast a bare suspicion upon another is incompetent and inadmissible.

In the case of *Greenfield v. People,* 5 N. Y. 76, 39 Am. Rep. 636, it is said:

"While evidence tending to show that another party might have committed the crime would be admissible, before such testimony can be received, there must be such proof of connection with it, such a train of facts or circumstances, as tend clearly to point out some one besides the prisoner as the guilty party. Remote acts, disconnected, and outside of the crime itself, cannot be separately proved for such a purpose."

In *State v. Moon,* 20 Idaho, 202, 117 Pac. 757, Ann. Cas. 1913a, 724, it is said:

"We do not understand that an orderly and unbiased judicial inquiry as to the guilt or innocence of a defendant on trial contemplates that such defendant should be permitted by way of defense to indulge in conjectural inferences that some other person might have committed the offense for which he is on trial, or by fanciful analogy to say to the jury that some one other than he is more probably guilty."

A well-considered case on the question here presented is *Horn v. State,* 12 Wyo. 80, 73 Pac. 705. The opinion by Justice Potter shows great research, and it is here quoted:

"It is urged that the court erred in these various rulings, and to support the contention the rule is invoked that, where the state depends on circumstantial evidence to convict a defendant, any testimony tending to show that some other person committed the crime is admissible. Counsel state the rule broader than that, and insist that testimony may be introduced tending to show that another person may have committed the crime; and the rule is so stated by some courts. But we think it is not generally or usually held that facts are competent which have no further effect than to cast a bare suspicion upon another. It is generally conceded that a defendant in a criminal case may, for the purpose of establishing his own innocence, prove such facts as tend to show that another is the guilty party, where the identity of the one committing the crime is a material point in issue. The question propounded to the witness Whitman does not on its face disclose a purpose or an ability to show such facts. In determining the admissibility of the testimony, therefore, the court had no further guide than the offer of proof made by counsel. Upon that offer, therefore, it is for this court to decide whether the exclusion of the testimony was or was not erroneous.

"One of the prominent rules of evidence is that it must tend to prove the issue. It is not necessary that every fact should bear directly upon the issue, but it becomes admissible if it tends to prove the issue, or constitutes a link in the chain of proof. The rule excludes all evidence of collateral facts which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute, and the tendency of which is to divert the mind from the point in issue, and to excite prejudice and mislead or confuse the jury. 1 Greenleaf on Ev. secs. 51, 52; Gillett on Indirect & Coll. Ev. sec. 54; *Com. v. Abbott,* 130 Mass. 472.

"The identity of the person who shot the deceased was a material point in dispute in the case. True, the prosecution relied upon a confession of the defendant, as well as upon proof of circumstances to establish his guilt. But he denied the genuine character of the confession, while admitting the statements attributed to him, denied that he did the shooting, and denied that he was where the killing occurred at the time. We think therefore it would have been competent for him to show by proper testimony that the crime was committed by another; and to that end he was at liberty, if within his power, to produce evidence reasonably tending to show such fact. The direct inquiry therefore is whether the offer on behalf of the defendant was sufficient to constitute the evidence admissible.

"It is evident that no precise rule can be laid down to govern the admission of such evidence in all cases. Much must depend upon the circumstances of the case, as well as the character of the evidence offered. It is held in some jurisdictions that threats of a third person are inadmissible as being *res inter alios acta.* See *State v. Davis,* 77 N. C. 483; *Alston v. State* 63 Ala. 178; *Carlton v. People,* 150 Ill. 181 (37 N. E. 244, 41 Am. St. Rep. 346.) And evidence of mere threats against the life of the deceased without more, is not generally held to be competent, for the reason that it has no legal tendency to establish the innocence of the defendant on trial. *State v. Beaudet,* 53 Conn. 536 (4 Atl. 237, 55 Am. Rep. 155); *State v. Hawley,* 63 Conn. 47 (27 Atl. 417); *Alexander v. United States,* 138 U. S. 353 (11 Sup. Ct. 350, 34 L. Ed. 954); *Com. v. Abbott,* 130 Mass. 472; *State v. Beck,* 73 Iowa, 616 (35 N. W. 684); *Ogden v. State* (Tex. Cr. App.) 58 S. W. 1018; *State v. Taylor,* 136 Mo. 66 (37 S. W. 907); Underhill on Cr. Ev. 332; Gillett on Indirect & Coll. Ev. 54.

"In *Commonwealth v. Abbott, supra,* the Massachusetts court, after stating that, as one step toward proving that some person other than the accused committed the crime, the latter had the right to prove such a state of ill feeling on the part of a third person as would furnish him with a motive for the commission of the crime, say: 'The existence of ill feeling as a motive for the commission of crime will not alone justify submitting to a jury the question of the guilt of a person entertaining such feeling. It becomes material only when offered in connection with other evidence proper to be submitted, showing that the person charged with such ill feeling was in fact implicated in the commission of the crime.' In *Carlton v. People, supra,* it is said: 'It is competent for the defendant to show by any legal evidence that another committed the crime with which he is charged, and that

he is innocent of any participation in it; but this cannot be shown by the admission or confessions of a third person not under oath, which are only hearsay. The proof must connect such third person with the fact; that is, with the perpetration of some deed entering into the crime itself. There must be proof of such a train of facts and circumstances as tend clearly to point to him, rather than the prisoner, as the guilty party.'

"In the Missouri case above cited, the court held that mere threats by third persons to commit the crime are wholly inadmissible in defense of the party on trial, because such matters are purely hearsay. But it was said that if the offer had been accompanied by the further offer to prove that the one making the threats had done some overt act toward the perpetration of the crime, or even had been seen in the immediate vicinity of the crime, at the time of its perpetration, a different ruling would perhaps he required.

"The question was discussed at length in the case of *State v. Beaudet, supra,* and it was held that proof of the threats offered would not have shown the party making them guilty of the murder, nor rendered the circumstances relied upon by the state inconsistent with the guilt of the accused or inconsistent with his innocence. And the court say: 'It does not seem to us possible that the proposed evidence could have impaired in the least the circumstantial evidence against the accused, and surely no one would claim that it could affect the evidence derived from the confession of the prisoner.'

"Now, the offer in the case at bar was not to show an ill feeling on the part of one individual, but of several, and it was not connected with any other offer to show overt acts on the part of such individuals toward the commission of the crime charged against the prisoner, nor even an opportunity on their part to have perpetrated the crime. Nor was there any evidence to that effect. It must be assumed that no evidence on the subject beyond that proposed was to be tendered. The offer was limited to the showing of a possible motive on the part of some one to do some injury to some member of the Nickell family, and perhaps to take the life of some member of that family. In our judgment, the offer cannot be construed as going beyond that. The proposal to show the general situation in the community we cannot conceive to have been at all competent, unless it would have had some relevancy in relation to the *res gestae;* and it is not explained how it would have been material in that aspect. It was not stated what it was expected would be

proven concerning the general situation, except the inference to be gathered from the remainder of the offer, viz., that feuds existed between the Nickell family and its neighbors. In the discussion so far, we have omitted any reference to the fact that the offer of proof was not specially directed to the killing of Willie Nickell, and that there was an entire absence of explanation as to what the proof would show as to the effect of the feuds upon the deceased, and in what manner they would be shown to be accountable for his murder.

"We do not perceive that the offered testimony would have had any reasonable tendency to establish the innocence of the defendant. Its effect, if any, could have been no greater than to generate a mere suspicion that some other person might have committed the crime solely because he entertained a feeling of ill will or hatred against the Nickell family at some time and may have uttered threats of taking life. The evidence offered does not come within the rule relied on by counsel for plaintiff in error, and the court did not err in excluding it."

The defendant offered nothing beyond the evidence which we have considered tending to connect Zeb Mackey with the crime charged, except the offer of proof made by calling Lou Janey Perryman as a witness to prove that Zeb Mackey was the father of her child, and that he had promised to get some money and leave the country with her. The evidence offered affords no reasonable presumption or inference as to the guilt or innocence of the defendant, and the only effect such course of examination could have would be to degrade the witness.

In *Castleberry v. State,* 10 Okla. Cr. 504, 139 Pac. 132, it is said:

"The privilege of degrading a witness by proof of disreputable conduct, not connected with the facts on trial, is one so liable to abuse that it should be closely guarded, and allowed only on the exercise of the judicial discretion, * * * and then only to affect the credibility of the witness."

Error is assigned upon the refusal of the court to give a series of instructions on the law of descent and distribution. The first was to the effect that, inasmuch as the undisputed evidence in the case shows that the two deceased children, Herbert Sells and Stella Sells, were minors, and lived with their mother at the time of their death, and that the father of said children

was not at the time of their death, nor for years prior thereto, living with their mother, the court charges you that all the property belonging to said children at the date of their death was inherited by their mother, and that their father, if living, or if he had been living at that time, would have inherited nothing. The second was to the effect that the Creek law of descent and distribution was in force with respect to the allotments set apart in the name of the deceased citizens of the Creek Nation, and the court charges you that, under such law, where the deceased allottee left both father and mother and brothers and sisters, the mother inherited the entire allotment to the exclusion of the father, brothers and sisters. The third was to the effect that, under the supplemental Creek agreement, the provisions of the original agreement putting in force the Creek law of descent were repealed, and the Arkansas law of descent and distribution was put in force and effect in the Creek Nation, and the court charges you that, under such law, where the deceased child left an allotment, the allotment descends to the father and mother jointly, to the exclusion of the brothers and sisters of the deceased.

We think these requests were all properly refused. Whether or not the defendant had knowledge of all these rules of descent and distribution was wholly immaterial, under the undisputed facts in evidence. The motives of men should be judged from the information upon which they act, rather than the accuracy of such information. The defendant's motive should be judged from his supposition as to the law of descent and distribution, rather than from the accuracy of his views upon that subject. As a witness in his own behalf, corroborated by the testimony of his codefendant Martin, it is admitted that they purchased from J. C. Johnson the allotment of Hardy Sells, and the interest of Hardy Sells, whatever it might be, in the allotments of his deceased children. Also, the allotment of his widow, Mrs. Zeb Mackey. By introducing this evidence, the defendant committed himself to the theory of defense that all his transactions with J. C. Johnson were in good faith; that he believed Johnson was the genuine Hardy Sells; and that the deeds so

executed and delivered to him conveyed all the right, title, and interest of Hardy Sells in the lands described therein.

We have carefully scrutinized all the instructions in the case, and we are clearly of the opinion that no error was committed by the trial judge. The charge of the court fairly and correctly stated the law of the case, and was fully as favorable to the defendant as he had any right to request.

It is also contended that the judgment should be reversed because of improper remarks of counsel for the state. In the course of his closing argument for the state, Mr. Rutherford, counsel for the state, used the following language:

. "Why don't you bring John Coombs here, and Doc Allen? You all represent the whole bunch, and they are in your control.

"Mr. Noffsinger: If the court please, we desire to object to the statement of Mr. Rutherford, and we ask an exception to that remark be at this time allowed to the defendant, and a record made of the same, as being prejudicial to the defendant.

"Judge De Graffenried: Your exceptions are allowed."

It is claimed that counsel for the state in making this remark was guilty of such misconduct that under the provisions of the statute entitled the defendant to a new trial. The statute provides that:

In all criminal proceedings, "the person charged shall at his own request, but not otherwise, be a competent witness, and his failure to make such request shall not create any presumption against him, nor be mentioned on the trial; if commented upon by counsel, it shall be ground for a new trial." (Section 5881, Rev. Laws.)

A codefendant is competent as a witness only at his own request. He is given the option to testify if he desires to do so. Under the constitutional provision that "no person shall be compelled to give evidence which will tend to incriminate him" (section 21, Bill of Rights), and of the statute above quoted, he cannot be compelled to testify, either for himself, a codefendant, or for the state, while he is a party in the case (*Buxton v. State, ante*, 143 Pac. 58), and any comment on the failure of a codefendant not on trial to testify is not within the latitute of legitimate argument. However, a comment on the failure of a

codefendant not on trial to take the stand cannot be considered as a comment on the failure of the defendant on trial to testify within the purview of the last clause of the statute above quoted. The cases cited by the defendant's counsel are all based upon comments on the failure of the defendant on trial to testify in his own behalf. Therefore, these cases do not establish the doctrine contended for by the defendant's counsel. But assuming that such remark was in violation of the spirit and contrary to the intent of the statute, and a misstatement of the law, it does not necessarily follow that the judgment should be reversed. There was ample evidence to sustain the verdict of the jury, and the remark of counsel could not necessarily have influenced the jury in arriving at their verdict. At most, it is a technical error that should be disregarded by this court, where it appears from the record, as it does in this case, that the defendant's counsel merely reserved an exception. Upon a proper request the error could have been corrected by an instruction of the court, or on motion to withdraw from the consideration of the jury the improper remark as not being within the legitimate argument. No such request or motion was made by counsel for the defendant.

Upon the most careful consideration of the record, and of the questions raised by the learned counsel for the defendant, we are unable to find any serious or substantial error, and we think it would have been most unfortunate for the administration of justice, if upon the evidence in this case any other verdict had been rendered.

The judgment of the district court of Muskogee county herein is therefore affirmed.

FURMAN and ARMSTRONG, JJ., concur.